AO 91 (Rev. 11/11)  Criminal Complaint

ORIGINAL

# UNITED STATES DISTRICT COURT

for the

Central District of California



United States of America

v.

WEI XU, aka George Xu, aka Wade Xu,

Defendant

Case No.

**19 MJ00294**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 9, 2014, in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Dealing in Firearms Without A Federal Firearms License |
| 26 U.S.C. § 5861(e) | Unlawful Transfer of an Unregistered Short-Barreled Rifle |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

JEFFREY M. BARTEL, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     February  **4** , 2019  **@ 3:24 pm**

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. ROZELLA A. OLIVER, U.S. Magistrate
Judge
*Printed name and title*

**AFFIDAVIT**

I, Jeffrey M. Bartel, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2010.   I am currently assigned to the Los Angeles Field Office's Long Beach Resident Agency.   My duties include, but are not limited to, investigating allegations of unlawful acquisition and transfer of firearms, various types of fraud, and obstruction of justice.   I have received both formal and informal training from the FBI and other institutions regarding computer technology and the investigation of electronic communications.   I am familiar with the interpretation and application of federal laws and federal court procedures, and have previously assisted in the execution of numerous federal search and arrest warrants, including search warrants for the search of e-mail and social media accounts, computers, digital media and associated storage.

2.   I am also trained to investigate firearm offenses, including violations of California and federal law and the National Firearms Act ("NFA").   Through my employment by FBI, I attended firearm trainings and am required to be familiar with firearm identification and use.   Prior to joining the FBI, I served in the U.S. Army, where I have received extensive training on a wide variety of firearms and weapon systems. During this investigation, I also worked closely with Special

Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

## II. **PURPOSE OF AFFIDAVIT**

3.    This affidavit is made in support of a criminal complaint charging Wei Xu, aka George Xu, aka Wade Xu ("XU") for violating 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without A Federal Firearms License ("FFL")),[1] and 26 U.S.C. § 5861(e) (Unlawful Transfer of an Unregistered Short-Barreled Rifle).

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended merely to show that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates are approximate.

## III. **SUMMARY OF THE INVESTIGATION**

5.    The FBI is investigating XU, a Watch Commander of the Los Angeles and Long Beach Seaport with the United States Department of Homeland Security's Customs and Border Protection ("CBP").  According to CBP records I reviewed, XU began his employment with CBP on February 23, 2004.  XU was born on November 25, 1962 and resides in Santa Fe Springs, California.

---

[1] The term "FFL" also refers to the federally-licensed dealership itself, such as a gun store or other business that is owned by a licensed firearms dealer.

6.    During its investigation, the FBI found evidence that XU is engaged in the unlawful business of dealing firearms without a firearms license.  XU has exploited his status as a federal law enforcement officer to acquire firearms not available to the general public and used an Arizona driver's license to purchase weapons in Arizona in order to transport and sell the firearms in California, all for a profit. Moreover, XU unlawfully sold four firearms, including a short-barreled rifle, and high-capacity magazines to an ATF Undercover Employee.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    XU Unlawfully Engages in the Business of Dealing Firearms Without a License, Makes False Statements on FFL Forms, and Sells a Short-Barreled Rifle to UCE**

1.    <u>Applicable Statutes</u>

7.    The relevant text of 18 U.S.C. § 922(a)(1)(A) provides:

> It shall be unlawful for any person except a licensed importer, licensed manufacture, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce[.]

18 U.S.C. § 922(a)(1)(A).

8.    The relevant text of § 921(a)(11) defines a dealer as:

> (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

18 U.S.C. § 921(a)(11).

9.   The relevant text of § 921(a)(21)(C) defines a dealer without a license "engaged in the business" of dealing in firearms as:

> [A] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C).

10.   The National Firearms Act ("NFA") requires certain firearms to be registered with the Secretary of the Treasury at the time the firearm is manufactured, imported, or transferred. The NFA defines a firearm to include "a rifle having a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3). ATF maintains the registry of all NFA registered firearms.

11.   The relevant text of 26 U.S.C. § 5861 provides:

It shall be unlawful for any person ---

(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or

(e) to transfer a firearm in violation of the provisions of this chapter[.]

26 U.S.C. § 5861(d), (e).

2.   Federal and California Firearms Law and
Record Requirements

12.   I know the following based on my training and experience, conversations with ATF Special Agents, and review of the United States Code and the California Penal Code:

a.   The California Department of Justice ("CA DOJ") Automated Firearms System ("AFS") records every lawful firearm transaction within the state of California, including Private Party Transfers ("PPTs"). AFS records for handgun purchases conducted through licensed firearms dealers are available since the 1930s; records for long-gun purchases, such as rifles and shotguns, conducted through licensed firearms dealers are available since 2014; and records for PPT of handguns and long guns listing the seller and buyer are available since 2011 and 2014, respectively.

b.   To be lawful under California law, a PPT, which is defined as a firearm transfer where neither party holds both federal and California dealers' licenses, must occur at a licensed firearms dealer or FFL. Additionally, under California law, the FFL must submit a "Dealer Record of Sale" ("DROS") for each PPT to CA DOJ.

c.   A DROS is an application to purchase or acquire a firearm in California and includes a description of the firearm(s) and the name and location of the FFL. For each PPT, the FFL must include the name, address, and a photocopy of the government identification of the parties to the transaction. In addition to the initial DROS submission, the FFL reports the

5

DROS to CA DOJ when the purchaser takes possession of the firearm.

d.   The submission of the DROS to CA DOJ initiates a background check of the buyer for every firearms purchase or transfer.  California law limits handgun purchases to one handgun per person per 30-day period.  Peace officers are exempted from the 30-day waiting period but are subject to a 10-day waiting period, absent a letter from the officer's chief of police.

e.   ATF maintains "eTrace," an Internet-based tracing system, that can trace a firearm's history from its manufacture to the first retail purchaser.  eTrace assists domestic and international law enforcement agencies by tracing the origin of firearms that have been recovered in criminal investigations.

f.   ATF requires FFLs to submit Multiple Sales Reports ("MSR") to ATF anytime the same individual acquires two or more handguns within five business days from the same seller. MSRs identify the purchaser and the firearms acquired and ATF uploads the information into eTrace.

g.   ATF Form 4473 is the Firearms Transaction Record promulgated by ATF that a buyer must fill out truthfully under penalty of a felony conviction for every lawful firearm purchase through an FFL.  Form 4473 describes the firearm purchased and identifies the name, address, and date of birth, government-issued photo ID of the buyer, a National Instant Criminal Background Check System ("NICS") background check transaction number, and a short affidavit stating that the purchaser is

eligible to purchase firearms under federal law.  Form 4473
contains the following warning:

> I certify that the answers to Section A are true and
> correct.  I am aware that ATF Form 4473 contains
> Important Notices, Instructions, and Definitions.  I
> understand that answering "yes" to questions 11.a if I
> am not the actual buyer of the firearm is a punishable
> felony. . . .  I also understand that making any false
> oral or writing statement, or exhibiting false or
> misrepresented identification with respect to this
> transaction, is punishable as a felony.  **I further
> understand that the repetitive purchase of firearms
> for resale for livelihood and profit without a Federal
> firearms license is a violation of the law.**

(Emphasis Added).

      h.    Question 11 of Form 4473 asks the buyer to
indicate if they are the "actual transferee/buyer" of the
firearm(s) listed on the form."  Questions 11 contains the
following warning:

> You are not the actual buyer if you are acquiring
> firearm(s) on behalf of another person.  If you are
> not the actual buyer, the dealer cannot transfer the
> firearm(s) to you.

      i.    At the time the buyer takes possession of the
firearm, which is often at the conclusion of the 10-day waiting
period, the purchaser must re-certify on the ATF Form 4473 that
all of the assertions made on the form during the initial
application are true, correct, and complete.

      j.    California law restricts the sale of handguns to
those certified by the state as "safe handguns."  Handguns not
on the "safe handguns" list are referred to as "off-list" or
"off-roster" and only certain exempted persons, including law
enforcement officers, may purchase these handguns from

retailers.  "Off-roster" handguns garner higher-than-retail prices in PPTs because of the restrictions placed on them.  In addition, manufactures frequently offer "off-roster" handguns to qualified law enforcement personnel at a reduced price, which further increases the potential profit margin for law enforcement personnel who resell them.  Although it is not illegal for an exempted person to transfer an "off-roster" handguns via PPT to a person who is not exempted, the inflated market for "off-roster" handguns incentivizes exempted persons to engage in the business of dealing firearms which, if they do not have federal and state licenses to deal firearms, is illegal.

### 3.   XU Engages in the Business of Dealing Firearms Unlawfully without a Licensee

#### a.   *Records Show XU Unlawfully Transferred 70 Firearms Since 2014 Without a License*

13.   According to the Federal Licensing System ("FLS") maintained by ATF that I reviewed, XU is not and has never been a licensed firearms dealer.

14.   According to AFS records I reviewed, XU sold or otherwise transferred 70 firearms via an FFL since 2014.[2]  Since 2014, XU transferred seven of the 70 firearms within two weeks from the date he purchased them.  Four of those seven firearms were "off-roster" handguns.  The chart below summarizes the

---

[2] Although it is likely that XU sold the firearms, because the DROS for PPTs do not indicate whether a firearm was purchased, as opposed to traded, it is not possible to definitively state whether all of the 70 firearms XU transferred were, in fact, sold.

seven transfers.  Many of these transfers occurred within days
of the purchase.

| Make, Model, and Serial Number | Off-Roster | Type of Transfer | Date of XU Delivery | Date of Transfer | Days to Transfer |
|---|---|---|---|---|---|
| Beretta mod. M9A1, BER630374 | No | Used-PPT | 05/09/2014 | 05/09/2014 | 0 |
| Heckler & Koch mod. VP9, 224010203 | Yes | New | 09/24/2014 | 09/26/2014 | 2 |
| Glock mod. 43, ZMY255 | Yes | New | 05/30/2015 | 06/12/2015 | 13 |
| Smith & Wesson mod. 686-6, CXS7842 | No | New | 07/07/2015 | 07/13/2015 | 6 |
| Walther mod. CCP, WK022925 | Yes | New | 09/03/2015 | 09/12/2015 | 9 |
| Browning mod. Hi Power, 511MW50872 | No | Used-PPT | 08/15/2017 | 08/17/2017 | 2 |
| Ceska Zbrojovka mod. CZ75 compact Shadow, C418748 | Yes | Used-PPT | 06/19/2018 | 07/06/2018 | 7 |

15.  Based the AFS records, my training and experience, and
conversations with ATF Special Agents, there is probable cause
to believe XU is engaged in the business of dealing firearms
without a license.  Specifically, the large number of known
firearm transfers and the short time period between the purchase
and transfer of some of those firearms indicates that XU
acquired the firearms with the intent to sell them and that XU
likely had buyers for some of the firearms prior to taking
delivery of the firearms.  While any single transfer XU made via
an FFL is legal, collectively, the number of firearms XU
transferred and the short time period between the purchase and
transfer of many firearms, strongly suggest that XU was
illegally engaged in the business of dealing firearms without a
license.

>    *b.    XU Operates Two Internet Accounts to Sell*
>    *Firearms Without a License*

16.    Based on the information described below, XU operates
two Internet accounts with www.Calguns.net ("Calguns"), an
online marketplace for firearms, firearms parts and accessories,
ammunition, and hunting and outdoor activities.  I know, from my
training and experience, and conversations with other law
enforcement personnel that Calguns is an Internet service
provider of electronic communications and an online marketplace.
Users can post advertisements for various items including
firearms, bid on items, and engage in private messages with
other users.  Calguns also hosts online public forums for
discussions on various topics related to the use of firearms.
Subscribers of Calguns accounts may view and respond to member
posts, as well as send and receive private messages (also known
as "PMs," "direct messages," or "DMs") through the site's
Private Message function.  Those private or direct messages are
visible only to the sender and recipient, not to other members
or the public.

17.    On August 30, 2017, the FBI retrieved a two-page
document from the trash left outside XU's residence in Santa Fe
Springs, California.  The document appears to be a spreadsheet
listing online accounts and login information, including
usernames and passwords for online accounts such as "Pay-Pal,"
"Bank of America," "Facebook" and others.  Two entries under
Calguns show the usernames "weixu" ("XU's Calguns Account One")

and "safari" ("XU's Calguns Account Two"), (collectively, "XU's Calguns Accounts").

18.  Calguns allows a user selects the "marketplace" in which to post a firearm advertisement.  "Private Firearm Sales - Long Gun" and "Private Firearm Sales - Handguns" are two marketplaces hosted by Calguns.  I reviewed the publically visible posts made by the usernames "weixu" and "safari" on Calguns.  Many of the accounts' posts were made in the "Private Firearm Sales - Long Gun" and "Private Firearm Sales - Handguns" marketplaces.

19.  As of January 25, 2019, XU's Calguns Account One initiated 58 threads (strings of posted communications), 28 in the marketplace forum "Private Firearms Sales - Handguns" and four in the marketplace forum "Private Firearms Sales - Long Guns."

20.  As of January 25, 2019, XU's Calguns Account Two initiated 44 advertisement threads, 25 in the marketplace forum "Private Firearms Sales - Handguns" and one in the marketplace forum "Private Firearms Sales - Long Guns."

21.  In addition, as detailed below, XU communicated with an ATF Undercover Employee ("UCE") via XU's Calguns Accounts to arrange for and negotiate the price of several firearms prior to meeting in person to finalize the purchases.

4.   <u>XU Exploits his Position as a Law Enforcement Officer to Sell "Off-Roster" Handguns</u>

22.  According to AFS records I reviewed, at least 14 of the 70 firearms XU transferred since 2014 were "off-roster."  In

addition, as discussed in detail below, one of the firearms XU
sold to the UCE and many of the firearms XU offered to sell to
the UCE are currently classified as "off-roster" handguns.
Because the FBI's investigation is ongoing and because
determining whether a handgun was classified as "off-roster" at
the time it was purchased is time-consuming, the exact number of
off-roster weapons XU transferred is not yet known, but it is
likely to be more than 14.  However, based on the totality of
the information described in this affidavit, there is probable
cause to believe that, for a substantial period of time, XU
engaged in the business of dealing in "off-roster" firearms
without a license, by exploiting his special status as a law
enforcement officer.

    5. <u>XU Unlawfully Sold Firearms to the UCE in
      California that He Purchased in Arizona Using a
      Driver's License He Did Not Disclose to His
      Employer</u>

  23. According to Multiple Sales Report ("MSR") records, XU
purchased at least two firearms in Arizona.  Arizona does not
require PPTs to be completed through FFLs, nor does Arizona
require that records are made and retained for every firearm
purchased through a PPT.  Thus, ATF would not have any record of
additional firearms XU purchased in Arizona that were not part
of a multiple sales purchase, meaning the purchase of two or
more firearms within a five-day period from the same seller, or
that XU obtained via PPT.

  24. According to a 2010 MSR report, XU purchased two
handguns at a gun show in Arizona and provided as identification

an Arizona driver's license, number D06528343, with an address
of 8622 North 59th Street, Glendale, Arizona.  According to
basic Internet research, the address on XU's Arizona driver's
license is a large apartment complex in Glendale, Arizona.
According to CBP records I reviewed, XU did not report to CBP
that he previously lived in or was otherwise associated with an
address in Arizona.  XU was required to report previous
residences in connection with his background investigation to
become a CBP Officer.

     25.  I know, based on my training and experience, that when
a person moves permanently from one state to another they are
required to obtain a driver's license or identification document
from the new state within a specific time frame, which varies
from state to state.  When a person applies for a new driver's
license, they typically are required to surrender their old
driver's license.

     26.  After learning that XU maintains an Arizona Driver's
License, I spoke with a CBP Officer who queried CBP's records
and found that XU has never disclosed to CBP his Arizona
driver's license or reported that he has lived at the address
listed on his driver's license.

     27.  In addition, as discussed in more detail below, eTrace
records show that one of the firearms XU sold to the UCE in
California was originally purchased by XU in Arizona.  Given the
number of XU's known transfers and XU's use of an undisclosed
Arizona driver's license to purchase firearms in Arizona, as the
FBI's investigation continues and additional eTrace records are

requested, it is likely eTrace records will show XU transported additional firearms into California that he originally purchased outside of the state.

   6.   XU Illegally Sells Firearms, Including a Short-
        Barreled Rifle, to a UCE in California

   28.   According to my review of screenshots taken by a UCE, beginning on June 12, 2018, the UCE, using two Calguns account profiles, responded to advertisements to sell firearms that XU posted on the Calguns website using XU's Calguns Accounts. Following communications between the UCE and XU using XU's Calguns Accounts, XU and the UCE arranged four in-person meetings, during which XU sold the UCE a total of four firearms, including an "off-roster" pistol, high-capacity magazines, and a short-barreled rifle, defined in 26 U.S.C. § 5845(a) as a rifle with a barrel measuring less than 16 inches.

          a.   On July 6, 2018 XU Sells an "Off-Roster"
               Handgun to the UCE and Offers to Sell
               Additional Firearms

   29.   On July 5, 2018, the UCE sent XU, via the CALGUNS SUBJECT ACCOUNT ONE, a private message ("PM") inquiring about a "CZ, model 75 Compact Shadow Line" that CALGUNS SUBJECT ACCOUNT ONE advertised for sale on June 27, 2018 for "$2,700 or best offer."  I know from my training and experience and conversations with law enforcement personnel, that a "CZ" model 75 Compact Shadow line is a variant of the Ceska Zbrojovka model CZ75 9mm pistol that is "off-roster" or "non-roster" in California, meaning that in order to purchase this CZ variant

lawfully from an FFL, XU would have had to present proof of his "excepted" status as a law enforcement officer.

30.   After exchanging several PMs, the UCE and XU, using XU's Calguns Account One, agreed to a negotiated price of $2,500 and for the sale to take place the following day at an FFL in Cerritos, California.   XU, using XU's Calguns Account One, provided the UCE with XU's telephone number 909-636-9537 ("XU'S Cellular Telephone") to communicate via text message.   According to subscriber records from Verizon, telephone number 909-636-9537 is registered to "WEI XU" at his residence in Santa Fe Springs, California.

31.   According to my review of ATF reports, my conversations with the UCE, and a surreptitious audio recording the UCE made, I learned the following:

a.   On July 6, 2018, the UCE exchanged a series of text messages with XU's Cellular Telephone to coordinate a meeting time at the FFL in Cerritos.   At approximately 2:00 p.m., the UCE arrived at the FFL and met XU, who was seated in a 2016 Green/Blue Honda CRV, License Plate No. CA 7WOV073, (the "Honda CRV") in the parking lot, as they had agreed.   The UCE later positively identified XU from XU's California DMV photograph.

b.   After exchanging greetings, XU retrieved a handgun box from Honda CRV's trunk and told the UCE, "You know the reason I am selling it.   I just bought a Python.   It cost me three thousand something dollars. . . . I have to sell—I have to

make room . . . ."   (A Python is a .357 Magnum revolver made by Colt).

      c.    XU showed the UCE the firearm, a CZ handgun, and stated, "It's a brand new one," that it had never been handled or shot, and that XU "had it for maybe a month or so."

      d.    XU asked if the UCE wanted to "pay [him] now," before they entered the FLL, the UCE agreed, and provided XU $2,500.  The UCE then accompanied XU into the FFL to finalize the PPT paperwork.

      e.    While they waited for the FFL to complete the PPT paperwork, the UCE told XU to keep the UCE's telephone number in case XU had other firearms for sale.  XU asked the UCE what type of firearms the UCE was looking to purchase and stated that he (XU) would send the UCE a list of firearms XU was willing to sell.

      f.    After completing the PPT at approximately 2:35 p.m., the UCE and XU exited the FFL and departed the area separately.

      g.    Later that day, at approximately 4:40 p.m., XU sent a PM to the UCE using XU's Calguns Account Two, even though XU had previously engaged the UCE using XU's Calguns Account One.  XU's Calguns Account Two PM stated as follows:

It was my pleasure to do business with you.  Here are some of the guns I may part with:

Pistol:
-Glock 34 w/night sights 9mm
-Glock 35 .40
-Glock 27
-HK P2000 .40 and 9mm

```
-HK P30 .40
-Springfield XDM .40
-SW99 .40
-S&W 686 Prelock 4"
-Browning Hi-Power 9mm

Rifles:
-AK 47 7.65x39 Romania
-AK 47 74 5.45 Polish
-MSAR .223
-FN FAL 308
-Sig 556
-Beretta CX4
-AR15
-PPS43
```

Let me know if you are interested in at [sic] any.

Thanks,
Wade.

h.    Before the UCE was able to respond to XU, at approximately 4:45 p.m., XU, using XU's Cellular Telephone, sent the UCE a text message stating that he (XU) had sent the UCE a PM with a list of firearms XU was willing to sell.  The UCE responded by text message stating that the UCE was looking at the list.

i.    At 5:33 p.m., the UCE responded to XU's PMs stating that the UCE would let XU know if the UCE was interested in purchasing any of the firearms.

32.  On July 17, 2018, after the 10-day waiting period required under California law to purchase a firearm elapsed, the UCE returned to the FFL and picked up the "off-roster" handgun purchased from XU.  According to my inspection, the CZ pistol XU sold the UCE bears the serial number C418748.

33.   According to a June 17, 2018 DROS record, XU purchased the CZ model 75 Compact Shadow Line that he sold to the UCE from an FFL in Artesia, California, and took possession of the "off-roster" pistol on June 29, 2018—two days after XU advertised the CZ for sale on Calgun's website and five days before XU offered to sell it to the UCE.  Because California law categorizes the handgun as "off-roster," the DROS indicates that XU provided documentation of his exempted status as a "peace officer – federal – active" in order to purchase the firearm.

34.   Based on my training and experience, and conversations with other law enforcement personnel, it is likely XU purchased the CZ pistol on June 17, 2018 with the intent to sell it for a profit, exploiting his status as a law enforcement officer to purchase a firearm not available to the general public, and made a false statement on the form in affirming under oath that he was the actual buyer when in fact he intended to sell the firearm, as evident by his advertisement to sell the pistol two days before he took possession of the pistol.  Furthermore, XU would have lied on the Form 4473 when he certified that his answers to the questions in Section A of the form were still true, correct, and complete, when in fact he was not the "actual buyer/transferee" and had already advertised the CZ pistol for sale.

> b.   *On July 12, 2018 XU Sells a Firearm He Purchased in Arizona to the UCE in California*

35.   On July 9, 2018, the UCE sent a text message to XU's Cellular Telephone inquiring about the availability of the "Sig

556" rifle XU offered to sell the UCE in the list of weapons XU provided to the UCE on July 6, 2018.  I know from my training and experience, that "Sig 556" is a reference to a Sig Sauer 5.56 caliber rifle.  After a series of text messages, XU agreed to sell the rifle, which he said was "new in box," to the UCE for $1,600 on July 12, 2018, at the FFL in Cerritos, California, where XU sold the "off-roster" handgun to the UCE on July 6, 2018.

36.  According to my review of ATF reports, my conversations with the UCE, and a surreptitious audio recording the UCE made, I learned the following:

a.  On July 12, 2018 at approximately 2:00 p.m., the UCE arrived at the parking lot of the FFL and recognized XU seated inside a 2016 Black Maserati Ghibli, License Plate No. CA 7SXK478, (the "Black Maserati").  XU and a woman, later identified as his wife, Y.L., exited the vehicle.  After introducing the UCE to Y.L., XU and the UCE stepped to the back of the vehicle outside Y.L.'s sight.  The UCE remarked on XU's expensive vehicle, a Maserati sedan, to which XU responded, "I'm like you, playboy."

b.  XU opened the trunk of the Black Maserati to reveal a blue rifle box containing the rifle.  XU explained that the UCE needed to "fix" the rifle in order to lawfully use it in California.  XU stated, "If you want to use it in a California range or something . . . you need to put a little release or something."

19

c.   XU told the UCE that he purchased the rifle in Arizona, where XU claimed to have lived, explaining that "you can buy anything" in Arizona but, that if he were to keep it in California "like this way," he would have to register it.   XU told the UCE, "I transport[ed] it here, there's no registration requirements, so I never registered a rifle . . . but if I want to keep it like this way, I, I, will have to register it, but I don't care, if you want it, I give it to you."   When the UCE asked if he (the UCE) needed to do anything to make it compliant with California law, XU responded, "I don't care, if you want it, I give it to you."[3]

d.   Later in the conversation, XU described himself as a "dual resident," explaining that lives in Arizona in the winter and California in the summer.

e.   The UCE asked XU if they should go inside the FFL to complete the PPT lawfully.   XU stated, "No, you don't need to . . . it's up to you."   The UCE responded, "Ok, alright . . . yeah, let's just do it here then."

f.   On several occasions during the meeting, XU told the UCE the he had made a mistake in asking only $1,600 for the firearm and showed the UCE his cellular phone that displayed an advertisement purporting to sell the same type of firearm for $1,895.   The UCE stated that he only brought the $1,600 they

---

[3] Based on my conversations with ATF Special Agents, XU is likely referencing an outdated California law requiring persons to register certain rifles that Arizona did not regulate.   Under current California law, the rifle XU transferred to the UCE would qualify as an assault weapon, which is illegal to possess or transfer in California.

agreed upon but was interested in making additional purchases, specifically of the MSAR rifle XU offered to sell as part of the list of firearms XU sent the UCE on July 6, 2018.  The UCE asked XU to hold the MSAR rifle for him, they agreed to the original price of $1,600 for the Sig Sauer 5.56, and the UCE took possession of the rifle.  The UCE took the rifle to his vehicle at which time he observed XU and Y.L. enter Black Maserati together and exit the parking lot.

37.  Based on my inspection of the rifle XU sold the UCE on July 12, 2018, the firearm is a Sig Sauer 5.56 Caliber NATO rifle bearing serial number JT007064.  According to the eTrace record for this rifle, XU originally purchased the firearm in Arizona on December 4, 2009 from an FFL in Phoenix, Arizona.

         *c.*   *On August 12, 2018, XU Sells the UCE an MSAR Rifle and High-Capacity Magazines out of the Trunk of His Vehicle and Offers to Sell the UCE a Short-Barreled Rifle*

38.  On July 9, 2018, XU sent the UCE a text message containing a web image of an MSAR rifle, stating, "[h]ere is another interesting rifle you might be interested in" and offered to sell it to the UCE for "2K."  Between July 26, 2018 and August 12, 2018, XU and the UCE exchanged a series of text messages and PMs via Calguns, eventually agreeing to meet on August 12, 2018 in the parking lot of the FFL in Cerritos, California, for XU to sell the MSAR rifle to the UCE.

39.  According to my review of ATF reports, my conversations with the UCE, and a surreptitious audio recording the UCE made, I learned the following:

a.    At approximately 4:20 p.m. on August 12, 2018, the UCE arrived at the parking lot of the FFL in Cerritos, California, and walked over to XU's vehicle, the Black Maserati.

b.    After exchanging greetings, XU stated that he wanted to show the UCE something, and opened the trunk of Black Maserati to reveal a printout from an Internet website for a "Polish PPS-43 Parts Kit" on sale for $74.95 and a soft protective rifle case.  XU told the UCE that he brought the semi-automatic PPS-43 for the UCE to purchase and that the UCE would need the parts kit if the UCE wanted to convert the PPS-43 rifle into a fully-automatic firearm.  XU first offered to sell the UCE the "PPS 43" in the list of firearms XU sent the UCE on July 6, 2018.  A "Parts Kit" is a tool kit, commonly sold online, that allows a user to convert semi-automatic firearms into fully-automatic firearms.

c.    XU showed the PPS-43 rifle to the UCE and explained, while physically manipulating the firearm, how to convert the PPS-43 into a fully-automatic firearm.

d.    XU told the UCE that the PPS-43 was a "pistol" but that the UCE could easily convert the "pistol" into a "rifle" by removing a non-permanent bolt from the stock of the pistol and changing the trigger grip.  XU stated, "It's very simple.  Just pull it out and change the bolt here."  XU advised, "Right now it's legal as is . . . as a pistol.  But if you want to take to the desert, that's fine.  If you want to take it and leave it at home, just take the parts out . . . that means it's not a pistol."

e.    I know based on my inspection of the PPS-43 that XU later sold to the UCE on August 21, 2018, and my training and experience, that the PPS-43 XU showed to the UCE (and later sold to him as detailed below) was configured to be a short-barreled rifle.  As detailed above, it is illegal under Federal law to possess or sell a rifle with a barrel measuring less than 16 inches that is not registered with the ATF.  As XU explained to the UCE, the PPS-43 rifle did not have a permanent restriction preventing the stock of the rifle from unfolding and XU cautioned the UCE not to let anyone see him use the short-barreled rifle as it would get the UCE in trouble.

f.    The UCE explained that he had only brought enough money to purchase the MSAR rifle they had previously discussed, but asked XU to hold on to the PPS-43 rifle, and XU agreed to do so.

g.    XU then initiated a conversation about high-capacity magazines.  XU stated that he had AR-15-type high-capacity magazines with him inside the vehicle.  I know from my training and experience that AR-15-type high-capacity magazines typically hold 30 rounds of ammunition and that, under California law, it is illegal to possess or transfer magazines that hold more than ten rounds of ammunition in California, unless the individual is exempted from the prohibition, as in this case, by virtue of being a law enforcement officer.  XU showed the UCE several high-capacity magazines inside a box in XU's trunk.  XU stated, "But I can't transfer it [AR-15 high-capability magazines] cause it's not legal to sell magazines

here." However, XU first stated that if the UCE brought a "block or something" to restrict the capacity of the magazines, XU could sell him the magazines. I know from my training and experience that high-capacity magazines can be rendered California compliant by inserting a "block" or object that restricts the maximum number of rounds the magazines can hold to ten.

h. After a few minutes, however, XU said he would be willing to sell the high-capacity magazines to the UCE "as is," stating "No, I, I don't mind to be honest. . . Like I said already, I only deal with people that I know, you know? We don't want to get in trouble." XU agreed to sell five high-capacity magazines for a total of $100.

i. While XU and the UCE engaged in small talk, XU stated that he works in the auto parts business.

j. XU and the UCE then began discussing the MSAR rifle that XU had previously arranged to sell to the UCE. XU then showed the UCE a box marked "MSAR" in red lettering, and opened the box to reveal an MSAR rifle and high-capacity magazines. XU stated that MSAR rifle was brand new and easy to convert into a fully-automatic rifle.

k. The UCE provided XU $2,100 in cash and took possession of the MSAR rifle and five high-capacity magazines.

l. Following the transfer, XU stated, "We are like drug dealers." While pointing to the PPS-43 short-barreled rifle, XU stated that "this will be the next one, because it is cheap . . . and very easy to convert." XU explained that "You

cannot buy it in California [and] it is not on the California roster either." XU claimed to have purchased it in Arizona several years before. XU and the UCE exchanged goodbyes and left the parking lot.

       m.   At no time did XU or the UCE enter the FFL to complete the DROS paperwork for the transfer of the MSAR rifle, as required by Federal and California law.

       n.   Following the exchange, ATF inspected the MSAR rifle and determined that it was a model STG-556, .223 caliber rifle, bearing the serial number 600-P001488, and determined that it would be classified under California law as an "assault weapon." Under California law, it is illegal to possess or transfer an unregistered assault weapon. According to AFS records I reviewed, XU has no assault weapon registered to him.

       *d.   On August 21, 2018, XU Sells a Short-Barreled Rifle and High-Capacity Magazines to the UCE*

    40.  On August 13, 2018, the UCE sent XU's Cellular Telephone a text message inquiring about the short-barreled PPS-43 rifle XU had shown and offered to sell to the UCE on August 12, 2018. XU and the UCE arranged to meet on August 21, 2018 in the parking lot of the FFL in Cerritos, California, and agreed to a negotiated price of $800.

    41.  According to my review of ATF reports, my conversations with the UCE, and a surreptitious audio recording the UCE made, I learned the following:

a.   At approximately 5:00 p.m. on August 21, 2018, the UCE arrived at the FFL parking lot and observed XU in the driver's seat of the Honda CRV.

b.   After exchanging greetings, XU opened the trunk of Honda CRV and revealed the short-barreled PPS-443 rifle XU previously showed the UCE on August 12, 2018.  XU again showed the UCE how to convert the short-barreled rifle into a fully-automatic firearm by removing the pin that blocks the trigger mechanism from firing automatically.  XU explained "Like I said, this is very simple.  If you have the stock folding it's a pistol . . . . It's okay.  If you pull the stock open – it's called a short barrel rifle. . . . It can be folded . . . . It can be unfolded."   Manipulating the rifle, XU stated, "little tabs just cut if off.  That's it.  It's, uh, it will unfold . . . . It's so simple."

c.   XU advised the UCE not to unfold the rifle in public, "don't get yourself in trouble," but that he could unfold the short-barreled rifle in the desert.

d.   XU further advised that if the UCE wanted to convert the firearm into fully-automatic and shoot it, he would need to unfold the stock, "you shoot full auto you need a stock to hold it . . . otherwise it's going to shake too much."

e.   The UCE provided XU with $800 in cash for the short-barreled rifle.

f.   XU also asked if the UCE wanted additional high-capacity magazines.  XU stated that he had a friend coming from Arizona the following month and he could get the UCE additional

high-capacity magazines if the UCE wanted. XU stated that he had three high-capacity magazines on him and would sell them to the UCE for $58. The UCE provided XU with $60. XU did not return the $2 difference as UCE told XU to keep it.

g. XU placed the short-barreled rifle and the three high-capacity magazines in the UCE's trunk. XU stated, "So, don't, don't get yourself in trouble because the magazines, it's high cap, that's why I set it. Yeah, so don't go to the public range." XU and the UCE exchanged goodbyes.

h. At no time did XU and the UCE enter an FFL to record the PPT as required by California law.

i. Following the sale, the ATF determined that the firearm was a Wise Lite Arms Inc., model PPS43, 7.62x25 caliber rifle bearing the serial number WLA27-502. The rifle stock was extendable and the barrel measured only 11 inches in length. ATF further determined that the firearm XU sold to the UCE on August 21, 2018, was a short-barreled rifle that is illegal under federal law to possess or transfer, unless the rifle is registered.

j. ATF queried the National Firearms Registration and Transfer Record and found that the short-barreled PPS-43 rifle was not registered as required by the National Firearms Act. ATF further determined that XU does not have any firearms registered in the National Firearms Registration and Transfer Record.

**B.    XU's Income from the Sale of Firearms**

42.    As enumerated above, beginning in at least 2014, XU
purchased firearms and resold them to third-parties with
regularity.  Based on the records I have reviewed, XU earned
income from the sale of firearms.

43.    Based on Wells Fargo bank records I have reviewed, XU
owns a Wells Fargo bank account ending 9791, which was once held
with Wachovia Bank.  Wachovia Bank documents I reviewed show
that in 2007, XU listed this account as a "Crown Banking"
account.

44.    Based on bank records I have reviewed, in March 2009,
XU opened a bank account ending 2845 with United Central Bank
with Y.L.  Based on a review of open source material, in 2014,
Union Central Bank was acquired by Hanmi Bank.  In October 2016,
the account was closed.

45.    Based on the information received from Calguns and my
review of XU's bank records, XU received cash for the firearms
he sold to third parties, some of which he deposited into his
bank accounts, typically the same day he sold the firearm.
Specifically, I found the following firearm sales and
corresponding bank account deposits:

      a.    Based on AFS records I reviewed, on April 29,
2014, XU purchased a Beretta M9A1 9mm pistol at a firearms
dealer in Artesia.  On May 9, 2014, XU sold the firearm to a
third-party.  According to XU's bank records, on the same day,
XU made three ATM cash deposits that totaled $530 into his Wells

Fargo account ending 9791 and made one cash deposit of $400 into his Hanmi Bank account ending 2845.

   b.   On May 20, 2015, XU purchased a Glock 43 9mm pistol, which he sold to a third-party on June 12, 2015.  On June 12, 2015, XU made two deposits into his Wells Fargo bank account ending 9791:  1) "Edeposit in a branch/store" of $2,400 and 2) ATM cash deposit of $1,000.

   c.   On May 29, 2014, XU purchased a Glock 17 9mm pistol which he sold a year later to a third party on June 19, 2015.  On June 20, 2015, XU made 3 ATM cash deposits into his Wells Fargo account ending 9791 for a total of $1,000.

   d.   On April 18, 2014, XU sold a firearm to a third-party and on the same day, he made a $1,000 deposit into his Hanmi Bank account ending 2845.

## V.  CONCLUSION

46.  For all the reasons described above, there is probable cause to believe that WEI XU has committed a violation 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without an FFL)), and a violation of 26 U.S.C. § 5861(e) (Unlawful Transfer of an Unregistered Short-Barreled Rifle.

JEFFREY M. BARTEL
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Subscribed to and sworn before me
this  4th  day of February, 2019.

HON. ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

30